May it please the Court, my name is Sam Hassett and I represent the petitioner Tobias Romero Quitanilla. This is a case involving special rule cancellation of removal and there are three main points I would like to get to. First I'll give you a general facts as far as how Mr. Quintanilla came to the States and his brief history. He's 48 years old, he has three children that are United States citizens. The oldest is 20 years old and the youngest is 12. He was in the Salvadorian Army from 1981 to 1987. This is from the ages of 15 to 20 and he began his service in the infantry third grade from 1981 to 1984 and then was transferred to the Prel, which is a special reconnaissance unit where he served until 1987. This was during the Civil War in El Salvador and this was a unit that was trained by the United States. Main issues on appeal here are whether there was sufficient evidence to indicate the possibility of persecution, sufficient to invoke the persecutorial bar and shift the burden to the petitioner. More specifically, whether or not simply being a member of a military unit during wartime without more is enough to invoke this bar. The second issue is whether the harm that is incidental to a military objective in an And the third is generally courts have found that civil strife is not sufficient to form a protected group. That means that Civil War, there's not a protected group for persecution purposes. Therefore, in this case, the alleged victims, who we're not actually sure who the victims are, are not a protected class and they are simply victims of societal violence and not As far as the Prel and what it exactly is, essentially what we have here is this unit that there's some indication they created human rights abuses. As a member of the Prel, the petitioner was simply an intelligence gatherer. The IJ and the BIA emphasized that he was involved in the arrest of 20 to 50 suspected guerrillas. The Civil War is essentially between the Prel and the guerrillas, which is the FMLH. This was a civil war where the guerrillas controlled one-third of the land area in the country, which is over 5,000 square kilometers. Military patrols, now this is the Prel units, patrolled 50% of the country but maintained no permanent position for fear of retribution from the long-range reconnaissance units. Now the reason this is important is because in 1983, Congress established a national bipartisan commission on Central America known as the Kissinger Commission. In January 1984, that commission issued a report which defined El Salvador important to U.S. interests and deemed strategically unacceptable a victory by the guerrillas or the FMLN. It recommended heavy U.S. money to finance a rapid buildup of the government's armed forces, leaving combat responsibilities to the Salvadorians. The U.S. military, the U.S. sent 100 military advisors to help and train the Salvadorian crew. And from 1980 to 1987, those troops went from 17,000 to 56,000 troops, of which the Petitioner is one of them. El Salvador received 72 helicopters and 63 airplanes to help support the U.S.'s mission. Now, the government erred here, or the I.J. erred, in finding that there was an indication of persecution by the Petitioner while he was a member of the PRAW. What that means is that he either ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular church, or political opinion. As I stated in the briefs, there is no proof that the Petitioner did any of this. Now, apparently there's an impermissible shift to me, because there's such a lack of evidence, that shifts the burden to the Petitioner to show that he did not persecute anybody. But with such little evidence that he did, or that there was, that there might even be a possibility of persecution, how is he to prove that he did not do something? He does not know where these 20 or 50 people that he took in a combat situation? Well, did the I.J. expressly find that your client knew he was assisting in the persecution, or at least willfully blind to that fact? He said it's likely that he knew. Likely that he knew is not sufficient. Or willfully blind to the fact. I believe the I.J.'s exact words in the second opinion or the first opinion? Well, I'm delighted to have you guide me through. Okay. On the second opinion. What page are we looking at? The appendix. Okay. About 584 or 585. It's page two of the I.J.'s decision. For some reason the page numbers are cut off on this one. I mean, it says here that he instigated or arrested, that the individuals he investigated or arrested would likely be tortured or killed. Likely is not enough. Those people have to actually, if you look to the other circuits, I'll get to this circuit, but if you look to like the ninth circuit, I mean to the... It doesn't say anything about willful blindness. I don't have it in front of me. Oh. Okay. I mean, it may. Right. Okay. I think it might be in the BIA. All right. I don't mean to talk to you. Go ahead. I don't want to use your time. Okay. Well, essentially, I mean, to answer your question a little further, even willful blindness wouldn't be sufficient. Okay.  Would be insufficient, you say. Be insufficient. Willful blindness would be insufficient. Yes. Right. Okay. Those, the actions that he took has to directly go towards the persecution of at least one individual. It can't be a hypothetical that they may have been persecuted. Okay. And this comes from the sixth circuit case of Diaz-Zanata v. Holder. Of course, in here, in the fourth circuit, the main cases are Barahona and Pastora on this issue. Now, we know in Barahona, the issue was slightly different in that it was giving material support to a guerrilla or a terrorist organization, and he was found to have given use of his kitchen and his house by force, and that that was giving material support. How this is separate from that is that, first, it was a terrorist organization. Second, he was not a military that was supported by the U.S. government, and it was not general civil strife. In Pastora, which is the most recent decision, it's basically the same issue why this is separate, is that, again, he was not a military member in Pastora. He was a civil patrol, and the persecution that occurred occurred in the exact time and place that his civil patrol patrolled. There is no indication on the record that that happened in the petitioner's case. Everything in the petitioner's case is very general in nature. And then in Higuet v. Gonzalez, which is slightly similar to this case, there was an intelligence officer, but again, not a military person, but an intelligence officer, and was not a part of the military. But in Higuet, he admitted to hurting many people and that his information led to the imprisonment and death of individuals. I think we have to go back to why this law is actually put into place, and we go back to Fedorenko, which is a seminal Supreme Court case. That was based on the Holocaust, and where you have a government that is persecuting a people. This is not something that's occurring during a civil war. Now, I think in Fedorenko, he was a guard, and that is a totally different animal than this. This is a civil war. In matter of AH, it was clear that general civil strife and violence that occurs as a matter of an armed conflict does not amount to persecution. And in fact, the IJ stated that in his initial decision in 2008, that if he wasn't a member of the PRAL, and he had just been a general armed conflict, then he would not have been subject to this prosecutorial bar. On page 590 of the record, the IJ states, it says that if he's a sole, it's actually on page 589, if he's a soldier and he's involved in combat operations where there are offensive operations or defensive operations, that's the job of the military to kill or capture the enemy. So that would not make him a persecutor. And that's exactly where we stand here on this issue, is that he was simply in the military, there's no indication that he persecuted anyone, and there's not enough to even move the burden to where he has to prove that. And if he does, it's an impossibility of, it's impossible to prove a negative that he did not, he was not part of this persecution. I think my time is about up, unless you have any questions. Thank you. May it please the Court. My name is Edward Wiggers. I represent the respondent in this matter. The Board properly found Petitioner ineligible for NACARA cancellation because he is an alien described in 8 U.S.C. section 1231b3b1. He was a sergeant who led an elite unit that detained guerrillas and their suspected supporters among the civilian population, and then turned them over to interrogators with a documented history of human rights abuses. In an army, which, while he was in the army, when he was, the army in which he was serving was intentionally terrorizing the civilian population to keep them from supporting the guerrillas. Was that an army we trained? We taught them how to make the prowls, Your Honor, yes. The 3rd Special Forces Group assisted in that regard. But as far as how the prowls actually performed. Go ahead. As far as how the prowls actually performed in the conduct of the war, that was at the direction of the Salvadoran authorities. Okay. So they went beyond this pale here. This fella did, is what you're saying. Yes, Your Honor, that's what the evidence in the record states. Tortured on the other side. And Mr. Hassan says his man's just a soldier. He was more. A mere soldier, right? Yes, Your Honor, he was more than that. But he'd be right if he is just a mere soldier. He'd be correct here. Yes, Your Honor. But you say that the immigration authorities have to get deference in that regard? Could you repeat your question, please, Your Honor? You're saying the immigration authorities are entitled to deference in regard to the proposition that he was not a mere soldier. Yes, Your Honor. The substantial evidence in the record supports that conclusion. But in addition to the adverse credibility finding. Petitioner was a sergeant who had 40 soldiers answering to him. Who would break up in teams of five or six and take lists of names that they received from the intelligence section at their brigade headquarters. To go out into the jungle and find specific individuals. So he's really a leader? Yes, Your Honor. He was a leader. He was a leader of an elite unit designed to go out and find people and bring them in to be interrogated by organizations that regularly employed torture, which was widely known. And if he doesn't go out and find these people and bring them in and hand them over, they can't be tortured. So he fits within the high-gut analysis of the process for when one is involved in the process and it's enough to be tied to persecution. Did anybody ever find that he knew they were going to be tortured or that it was just something lighter than that? It seems from the board's decision, Your Honor, it was more along the lines of the likelihood. But looking at the Diaz-Zanada. No, wait. The board's decision, you're talking about the one that starts at 584 or the board itself? The board decision, Your Honor, the most recent one. The board's finding on this point on page four of the joint appendix. Page four? Yes, Your Honor. Okay. Given the apparent widespread and indiscriminate human rights violations committed by the. You're in the middle of the page. I am in the second, start of the second full paragraph on the page. Right. Given the apparent widespread and indiscriminate human rights violations committed by respondents unit and other similarly situated units during the period of military service, we find no clear error in the immigration judge's conclusion that even if respondent committed no atrocities himself, the respondent was aware that individuals he investigated or arrested would likely be tortured and killed by the armed forces of El Salvador. Am I remembering correctly that the IJ specifically found that Quintanilla's unit killed and tortured people during the time he was providing them with intelligence? Yes, Your Honor. When he was a sergeant in the Prowl. You are correct. There were 36 documented instances of human rights violations, including torture and murder by his brigade, the brigade to whom he was handing over these people. And it was the intelligence sections in the brigade that were usually torturing and murdering because they're the ones who are receiving the people and interrogating them. So, and it's an important note regarding the evidence in this case. The El Rescate database in particular was prepared by journalists and human rights advocates working under highly repressive situations and conditions to try to gather information. As the documents in the record with the database note, if someone was below the rank of major, then they were unlikely to be prominent enough for the authorities or for the observers on the ground to have documented their conduct because based on the conditions, it was very difficult to identify the units, let alone the actual people involved. And I'd like to address the three... Now, was the language that the board used that he was aware that the individuals he investigated or arrested would likely be killed or tortured, tortured and killed by FAES? Yes, Your Honor. Is that in the I.J. opinion? My recollection is it is, Your Honor. I'm looking for it now. Is it a quote or has it been recast? That's what I'm getting at. The wording might be slightly different, Your Honor, but my recollection is the tenor of that line was in there. What did the I.J. actually say? What are we talking about here? Yes, Your Honor. I'm looking at the most recent I.J. decision, which runs from pages 54 to 57 of the Joint Appendix. I don't want to get you bogged down. Go ahead and make your argument. Yes, Your Honor. Basically, what the immigration judge found was that the petitioner should have known or it was basically a willful blindness approach. I love that, too, but I couldn't find that language when I was looking. Willful blindness language wasn't in there, Your Honor, but the immigration judge and the board both discussed the widespread nature of the human rights issue. That's what I'm trying to find is what the immigration judge actually said because the language that's in the BIA is not a quote. Yes, Your Honor. I couldn't find the language, and I was wondering if you could point out exactly what the immigration judge said. He's the fact finder that we give deference to, right? As affirmed by the board, yes, Your Honor. We don't give – the board didn't hear the evidence. The I.J. did. Yes, Your Honor. I can look again for that in a moment. I would like to address some of the points Mr. Hassan made in his presentation. Whether being in the military without more is enough, there clearly was more here as he was a leader in an elite unit and the specific role of this unit. And whether harm from a civil war is enough, this was not just a civil war. This was a political endeavor on both sides. And there is ample evidence in the Joint Appendix that supports that. That's usually what a civil war is, I thought. In this case, Your Honor, it was two political ideologies that were fighting each other, and the government's – Well, that's sort of what we had here 150 years ago. Yes, Your Honor. But in this case, the government forces in El Salvador were trying to terrorize the entire countryside into not supporting the guerrillas. It was – it went far beyond what ordinarily occurs, where they were – there were massacres in the thousands of villages that were not participating in the fight. They were targeting noncombatants for torture and murder. It wasn't just – and when the language in the context of just the civil war, it is usually in the context of the actual fighting. If you're a soldier and you kill enemy troops, you are not persecuting them if it's in the course of combat. But if you are a soldier and you go out and you kill innocent civilians who are not combatants, that's totally different, and that's what the Salvadoran Army was doing. Is the language – and maybe we've moved past this while I was looking – that the court finds that the respondent most likely understood that the individuals he arrested, investigated or arrested, would be tortured and killed, and then the government need only present evidence that indicates that respondent need not prove that he actually persecuted or assisted in the persecution of others? Yes, Your Honor, I believe that's the language. And as far as the shifting of the burden, the petitioner is the one who is in the position to know what went on before he was actually there. But the way the analysis works is when the Department of Homeland Security presents evidence that suggests that the petitioner may have been involved in persecution. At that point, it is the petitioner's burden to prove by a preponderance that he did not. And ordinarily, credible testimony would be enough. However, in this case, the petitioner attempted to minimize his role in the military, even beyond what he had told the asylum officer in his Nicara interview, and taking the resulting adverse credibility finding from his efforts at minimization, as well as – He made an adverse credibility finding as to both stories he told? No, Your Honor. The immigration judge adopted the statements made to the asylum officer that the petitioner had arrested 20 to 50 people, both guerrillas and civilians. So he found him credible on – He found that to be credible. He found the – And the second story to be not credible? Correct, Your Honor. The story that he never arrested anyone, that a different unit was the one that was sent out to do the arrest, that he never fired his weapon, then he fired it only in training, then he fired it sometimes in combat. Those were not credible. Subject to the Court's questions, we would conclude by noting that there is no evidence supporting the claim of bias on the part of the immigration judge. The immigration judge was applying the law to the facts presented, and unless the Court has any further inquiry, we request that the Court deny the petition for review. I just have a few things in rebuttal. So the petitioner was not some type of a leader of this parole unit. That seems to be something that's been a common theme. A sergeant is an enlisted officer. It's only two steps below an entry-level private. In the other cases, everybody was a much higher-level individual. I guess the government is attempting to state that because he was a low-level, he was a leader, but because he was a low-level officer, his name does not appear in the documents as a persecutor. I don't think you can have it both ways. Either you're a leader and you led these people to persecute others, and you would be listed in that, or you're not. There's nothing in the record. Is it your position that if you are not a leader but you do torture, you still should be able to get this exemption? No. Then not the leader doesn't get you all the way home, does it? No, it doesn't. But if you are a leader and you order it, it certainly gets you, puts that bar in place. Okay, that's number one. But in most of these instances, there has been some leadership instance or someone who has directly affected the commission. There's nothing in this case that shows anything that he was accused of, that he went into these groups and picked up these four or five people and brought them in for torture. I don't see that in the record. I haven't seen it in the record. I don't know where it's in the record, and there's no way for me to defend something that's not there. This has been my argument for the last seven years, that I can't make an argument from just blank statements on a piece of paper that this unit did this when there's not really anything to that. I'm sorry, what is there no evidence to because in the – That he went into – that he was a unit that went and gathered individuals, not combats, and brought them back for torture. I don't see where that is. I'm not sure where I can – I don't see that. There's a unit that may have done some of that. While charges of human rights abuse are widespread to FAES, Respondents Paramilitary Group Long-Range Reconnaissance Patrol also has been cited for many human rights abuses and killings. And then it cites a whole bunch of things to the record. But you say those things don't exist. No, I said they don't exist specifically to my client. But he was in that unit. He was in that unit for three years. That unit is a large unit. I always liken it to the Abu Ghraib in Iraq, which if you guys – I don't know if you remember. It's been a while now. But they had the pictures in the prison camp in Iraq. That was a large unit. There was only four or five individuals who actually did something that was offensive. That doesn't mean the entire unit is responsible for that. There has to be something more. The gun has also arrested individuals and turned them over to the brigade. And then it has a cite. Is that wrong? Yeah, but that doesn't say that they were not combat. That's correct, but that's not sufficient. That's what he stated, yes. What I have an issue with is the fact that they were civilians. They weren't combat individuals. The government has provided extensive evidence of abuses by FAES and PRAL to those that have come into their custody. You don't quarrel with that? No. There were some instances of that. Much of the abuse that was not committed by PRAL directly was conducted using surveillance previously gathered, such as identity and location of individuals, the kind of evidence that PRAL was responsible for collecting. You don't dispute that? They cite to the record respondent describing the role of PRAL. I do not. No, I don't dispute that. What I dispute is essentially what these units did was they were intelligence. They go out. They say, here's a unit here that might be attacking us at some point. They come back and tell their commanders or whoever, and then they go back out. Apparently, that was done through airstrikes, through military. These are just military operations. In order to have a persecution, it has to be based on one of the protected grounds. I don't see even torture. He's saying that he persecuted somebody. Persecution and torture does not count into that. I don't know why torture. The way I see it, he ordered, incited, insisted, or otherwise participated in the persecution of a person. Torture is not in that. Torture is Article 3 of the Convention Against Torture. This is persecution based on race, religion, nationality, membership in a particular social group, or a political opinion. If he's picking up random people, they don't fit into that class, for sure. If he's picking up combat, they fit into a class that's not protected because it's combat. Any further questions? No, I don't think so. Thank you very much. Thank you, panel. I appreciate it. We will ask the clerk to adjourn court, and then we will come down and greet the lawyers. Dishonorable Court stands adjourned until today at 2.30. God save the United States and dishonorable court.
judges: Diana Gribbon Motz, Robert B. King, Allyson K. Duncan